*383 OPINION OF THE COURT
Thomas A. Dickerson, J.
The Real Property Tax Law § 727 (1) Moratorium: Two Exceptions Reviewed
Real Property Tax Law § 727 (1) prohibits changes to real property tax assessments within three years of a court ordered reassessment with certain exceptions, two of which, RPTL 727 (2) (g) (25% or greater change in occupancy rate) and (2) (i) (change in classification or use) are discussed herein.
Factual Background
The subject property, known as 2 Perlman Drive, is improved with an office building and is identified as section 57.65, block 1, lot 8. The petitioner purchased the subject property in August 2002 for $2.5 million.[1]
The 2000 and 2001 Petitions
The prior owner of the subject property, Pascack Health Care Institute (PHC), commenced a prior tax certiorari proceeding which was settled by stipulation of settlement dated November 26, 2001 and by a court order dated January 17, 2002. The stipulation resulted in reductions to the 2000-2001 and 2001-2002 tax years’ assessments. No proceeding was initiated with respect to the 2002-2003 tax year.
The 2003 and 2004 Petitions
The petitioner filed tax certiorari petitions challenging assessments for tax years 2003 and 2004. Before this court is respondents’ motion for summary judgment seeking dismissal of the 2003 and 2004 petitions because they are prohibited by RPTL 727 (1).
The Three-Year Moratorium: RPTL 727 (1)
RPTL 727 is entitled “[prohibition against change in assessment following litigation.” RPTL 727 (1) states the general rule as follows:
“Except as hereinafter provided, and except as to any parcel of real property located within a special assessing unit as defined in article eighteen of this chapter where an assessment being reviewed pursuant to this article is found to be unlawful, unequal, excessive or misclassified by final court order or *384 judgement, the assessed valuation so determined shall not be changed for such property for the next three succeeding assessment rolls prepared on the basis of the three taxable status dates next occurring on or after the taxable status date of the most recent assessment under review in the proceeding subject to such final order or judgement. Where the assessor or other local official having custody and control of the assessment roll receives notice of the order or judgement subsequent to the filing of the next assessment roll, he or she is authorized and directed to correct the entry of assessed valuation on the assessment roll to conform to the provisions of this section.”
The RPTL 727 (2) Exceptions
The exceptions to RPTL 727 (1) are contained in RPTL 727 (2) (a) through (i) as follows:
“An assessment on property subject to the provisions of subdivision one of this section may be changed on an assessment roll where:
“(a) There is a revaluation or update of all real property on the assessment roll;
“(b) There is a revaluation or update in a special assessing unit of all real property of the same class;
“(c) There has been a physical change (improvement) to the property;
“(d) The zoning of such property has changed;
“(e) Such property has been altered by fire, demolition, destruction or similar catastrophe;
“(f) An action has been taken by any office of the federal, state or local government which caused a discernible change in the general area where the property is located which directly impacts on property values;
“(g) There has been a change in the occupancy rate of twenty-five percent or greater in a building located on a property which is not eligible for an assessment review under title one-A of this article (small claims assessment review);
“(h) The owner of the property becomes eligible or ineligible to receive an exemption; or
“(i) The use or classification of the property has changed.”
*385 Petitioner’s Arguments
RPTL 727 (2) (g) and (i) Apply
The petitioner asserts that RPTL 727 (2) (g) and (i) apply in that
“the occupancy and economic condition of the property have changed since the last taxable status date covered by the prior settlement [Jan. 2001] sufficiently to allow an assessment to be challenged on a property which would otherwise be subject to the three year ‘moratorium’ of RPTL 727 as ‘there has been a change in the occupancy rate of twenty-five percent or greater in a building . . . ’ RPTL 727 (2) (g) and ‘the use ... of the property has changed’ RPTL 727 (2) (i).”[2]
The RPTL 727 (2) (g) Exception
It is petitioner’s view that a comparison of the rent roll submitted in 2001 to the rent roll submitted in 2003 reveals more than a 25% change in the occupancy rate of the subject property.[3] Petitioner determined an occupancy rate of 64.4% from the 2001 rent roll, by dividing the vacant space of 10,725 square feet by 30,165 square feet (the total number of square feet) resulting in a vacancy rate of 35.67%. This number is then subtracted from 100% yielding an occupancy rate of 64.4%. Examining the 2003 rent roll using the same formula (20,584 vacant square feet divided by 30,165 total square feet results in a vacancy rate of 68.2% which is subtracted from 100%) yields an occupancy rate of 31.8%. Petitioner claims that this evidences a 32.6% change in the occupancy rate (64.4% - 31.8% = 32.6%).[4] Hence, the petitioner argues that there has been a greater than 25% change in the occupancy rate since the last tax year settled (2001) and the 2003 tax year, thereby bringing the matter within the RPTL 727 (2) (g) exception.
The RPTL 727 (2) (i) Exception
The petitioner also claims that RPTL 727 (2) (i) is applicable since
“the use of the building has changed from all medical use prior to our purchase in 2002 to a multitenanted general office use at a diminished rent by 2004. Specifically, while medical space commands *386 well over $20 a square foot rent, Perlman’s average new leases of nonmedical space are in the $15-$17 a square foot range evidencing a 25% loss in occupancy rates at the property.”[5]
Change of Use: Medical Facility to General Office Building
The petitioner claims that prior to its purchase of the subject property, the previous owner, PHC, had owned and, through an interrelated entity, operated the property as a medical/outpatient hospital facility which was affiliated with Pascack Valley Hospital. The building had been previously occupied by doctor’s offices and surgical suites, and approximately 6,800 square feet of suite 101 had been leased to Pascack Health Care Medical Associates, an entity related to the Pascack Health Care Institute.[6] After the petitioner purchased the subject property it was unable to attract similar medical tenants willing to pay the higher rental rates previously reached when the property was affiliated with Pascack Valley Hospital. As a consequence the use of the building has changed from all medical use (pre-2002) to a multitenanted general office building (2004) collecting diminished rents.
Economic Occupancy Rates
Due to this change in use the petitioner also claims that there has been a greater than 25% loss in the “economic occupancy rates.” The petitioner asserts that although the term “occupancy rate” is not defined in the statute, it is commonly used to describe the income or rent being received from a given party.[7]
The petitioner argues that
“a change in occupancy rate would, therefore, be defined as the difference in the amount of income being generated at a property from one period of time to another. Under this definition, the change in the occupancy rate of this property meets the criteria of RPTL 727 (2) . . . The occupancy rates at the property have decreased by both the amount of occupied space in the building as well as the achievable rents at the property between 2001, prior to Perlman’s purchase, and January 2003 and Janu *387 arv 2004.”[8]
The Prospective 2005 Petition
Additionally, petitioner opines that, once it proves that a RPTL 727 (2) exception is applicable, petitioner has the right to file not only for the 2003-2004 tax year but for the 2004-2005 tax year as well, admitting that there is no case law to that effect.[9] The petitioner then states that “if the Court finds 2004/05 to also be subject to RPTL 727, independently, the property can show an occupancy rate change sufficient to meet the exception in the statute for that tax year as well.”[10]
The Respondents’ Arguments
The RPTL 727 (2) (g) Exception Does Not Apply
According to respondents, the subject property had an occupancy rate of 41.75% as of January 2002 (derived by leased space of 12,593 square feet of a total of 30,165 square feet), and an occupancy rate of 31.76% as of January 2003 (derived by leased space of 9,581 square feet of a total of 30,165 square feet).[11] The respondents assert that the appropriate formula to be used in the instant matter is 41.75%-31.76% yielding a 9.9% change in occupancy rate and, therefore, the RPTL 727 (2) (g) exception does not apply.[12]
Counting Owner Occupied Space
Respondents assert that if the owner occupied space is included in the determination of the occupancy rate, the total leased space would be 18,093 square feet and the occupancy rate would go up to 63.30% in 2002 yielding a greater than 25% change in occupancy rate (31.54%). However, respondents argue that
“an owner who was not paying rent and left on its own or at the behest of a new owner thus creating the change in occupancy rate should not count toward a change. To allow an owner to move to create the necessary change in occupancy rate to challenge *388 a frozen tax settlement under RPTL 727 would be contrary to law, policy and equity.”[13]
The RPTL 727 (2) (i) Exception Does Not Apply
As for the RPTL 727 (2) (i) exception, respondents claim that petitioner’s lease data as provided in the rent rolls shows that there is a mixed use of the building which includes professional offices such as law offices.[14] Respondents complain that petitioner
“offers no basis that a medical building is a different use from other professional space or even from general office space. The only evidence provided is an alleged economic difference in rent from ($)15-($)17 rents from non-medical uses to rents of $20 and above in medical uses.”[15]
Economic Occupancy Rate
Respondents disagree with petitioner’s view that the term “occupancy rate” in RPTL 727 (2) (g) means “economic occupancy rate.” Respondents also reject petitioner’s view that if the rents were decreased by 25% or more petitioner could avail itself of this exception since “ [petitioner does not actually show any evidence of a rent reduction in excess of 25%. A mere conclusory statement is inadequate as a matter of law.”[16]
Discussion
Summary judgment is appropriate if there are no factual issues in dispute (see e.g., Andre v Pomeroy, 35 NY2d 361, 364 [1974] [“Summary judgment is designed to expedite all civil cases by eliminating from the Trial Calendar claims which can properly be resolved as a matter of law. Since it deprives the litigant of his day in court it is considered a drastic remedy which should only be employed when there is no doubt as to the absence of triable issues”]). The moving party bears the initial burden of making a prima facie showing of entitlement (see e.g., Bowen v Dunn, 306 AD2d 929 [4th Dept 2003]), which burden then shifts to the opposing party to come forward with proof to demonstrate the existence of an issue of fact (see e.g., Marinelli v Shifrin, 260 AD2d 227, 228 [1st Dept 1999]; New York Higher Educ. Servs. Corp. v Ortiz, 104 AD2d 684, 685 [3d Dept 1984]; Stern v Stern, 87 AD2d 887, 888 [2d Dept 1982]).
*389 Factual Issues In Dispute
Stated simply, the respondents have not met their burden of proof. The petitioner, however, has demonstrated the existence of factual issues sufficient to warrant a trial, including, but not limited to, whether “owner occupied” space constitutes occupied space when calculating the occupancy rate, whether the term “occupancy rate” includes the “economic occupancy rate,” or the rent received, and whether there has been a sufficient change in the occupancy rate and in the use of the subject property during the years at issue to bring the matter within the RPTL 727 (2) (g) and (i) exceptions.
Accordingly, respondents’ motion for summary judgment is denied in its entirety.

. Affidavit in opposition of Dale Allinson, sworn to Feb. 9, 2005 (Allinson affidavit), paras 3-5.

. Allinson affidavit para 9.

. Allinson affidavit, exhibit B (supporting affidavit of Judah Klein, sworn to Feb. 2, 2005 [Klein affidavit], at 4-5).

. Allinson affidavit paras 13-15; exhibits B, E.

. Klein affidavit para 8.

. Klein affidavit para 4.

. Petitioner’s mem of law, dated Feb. 9, 2005 (P mem), at 8, citing Beacway Operating Corp. v Concert Arts Socy., 123 Misc 2d 452, 456 (Civ Ct, NY County 1984) (“occupancy rate of $20,000 per month”); Thirty-Third Equities Co. v Americo Group, 294 AD2d 222 (1st Dept 2002); Salvation Army v Alverson, 157 Misc 2d 416, 418 (Civ Ct, NY County 1992).

. P mem at 8-9.

. Allinson affidavit para 16.

. Allinson affidavit para 17.

. Affirmation of Bruce M. Levine, dated Jan. 24, 2005 (Levine affirmation), para 9.

. Levine affirmation para 9 (respondents calculated a change in occupancy rate by using the methodology adopted in Matter of Washington Commons Assoc. v. Board of Assessors [4 Misc 3d 1027(A), 2004 NY Slip Op 51075(U) (Sup Ct, Albany County)], wherein one subtracts the new occupancy rate from the old one to yield the change in occupancy rate).

. Levine affirmation para 2.

. Levine affirmation, exhibit B; reply affidavit of Bruce M. Levine, sworn to Mar. 3, 2005 (Levine reply affidavit), para 5.

. Levine reply affidavit para 5.

. Levine reply affidavit para 4.